## Case No. 2,413a.

### The CARLOTTA.[1]

### GOMEZ v. The CARLOTTA.

Circuit Court, S. D. New York. July 31, 1879.

CARRIERS—DAMAGE TO CARGO—BURDEN OF PROOF —NEEDLESS SUIT—COSTS.

[1. Where the owners of goods claim that they were damaged during a voyage by rats and by oil, and the goods have been exclusively under their control or that of their vendees after their discharge from the ship, the burden of proof is on them to show by satisfactory evidence that the goods were actually damaged on the voyage as claimed, as well as the amount of loss or injury; and they cannot complain if, by failing to furnish the evidence, or satisfactorily excuse its omission, their case is looked on to some extent with suspicion.

[2. Costs should not be allowed to parties who have needlessly commenced a suit, instead of litigating the issues raised by them in a suit then pending, and to which they were parties.]

[Appeal from the district court of the United States for the southern district of New York.

[In admiralty. Libel by Raphael M. Gomez and Daniel V. Arquinbau against the bark Carlotta to recover damages for injury to cargo by reason of damage by oil and from rats. There was a reference to a commissioner to ascertain the amount of damage by rats or by the oil to such of the cargo as was delivered. See Case No. 2,413. On the coming in of the commissioner's report, exceptions were filed thereto, and thereafter an appeal was taken to the circuit court.]

Beebe, Wilcox & Hobbs, for Gomez.

Mr. Benedict, for the Carlotta.

WAITE, Circuit Justice. As the "Carlotta" has not appealed, the only questions presented here are those raised by the libellants in this case on the exceptions to the commissioner's report, and as to those, after a careful examination of all the evidence, I am entirely satisfied with the conclusions reached by the district judge. The burden of proof is on the libellants, and before they can recover they must show by satisfactory evidence that their goods were actually damaged on the voyage by rats or petroleum, and the amount of the loss or injury they have sustained from these causes. After the discharge of the cargo, they, or their vendees, had the goods within their exclusive control. They had in this way the means of securing at the time the very best evidence that could be obtained. If they have failed to produce it, and have not furnished a sufficient excuse for the omission, they cannot complain if their case is looked upon to some extent with suspicion.

There were three separate lots of the almonds, and they will be considered in their order.

1. The "Wiley, Wicks & Wing" lot. This was damaged by rats, holes having been eaten by rats in the bags. The commission-

---

[1] [Not previously reported.]

er has allowed only $200, while $325 is claimed. The exact extent of this injury might easily have been ascertained by inspection and count as the bags were put in store, or afterwards. Instead of that, the only evidence on which to fix the amount at $325 is a loose estimate, made by the parties to whom the goods were sold to arrive and who paid the full agreed price for a sound article on delivery. No one seems to have taken the trouble to make an actual count. Such an omission under the circumstances is, to say the least, suspicious, and I cannot but think the commissioner made an ample allowance for all the damage to this lot.

2. The Nordlinger lot. The claim here is for petroleum damage, and it is proper to remark in the outset that the first intimation to the vessel of this injury appears to have been given when the testimony was taken at the trial below, more than two years after the cargo was discharged and this litigation commenced. In the statement of claims made against the ship, under date of February 6, 1874, the only specification of damage to this lot was for 1,790 lbs. "almonds taken out." Petroleum damage was claimed only on the shelled almonds of Gomez & Arquinbau lot. Mention is made of 31 bags stained, but this is shown by the testimony of Willis, the managing clerk of the libellants, not to have reference to the Nordlinger almonds. The cartmen receipted for all that went to Nordlinger as in good order. They had been sold to arrive and paid for as a sound article on delivery, "claims for damages against the custom house and insurance companies" to belong to the purchasers. At this time it is manifest that damages by petroleum could not have been much thought of. The vessel sued to recover on its charter party, February 13, 1874, and this libel was filed for damages to the cargo, February 16th. The custom house appraisement of damages for a rebate of duties was made February 18th, and it nowhere appears from anything which then transpired that any damage by oil was considered or taken into the account. This lot was marked "C.," "F.," and "R. M. G." Only those marked "G. A." appear by the official certificates produced to have been impregnated with petroleum. In every other case where the certificate is produced damage by sea water and sweat of the vessel is noted, and nothing else. The shelled almonds and the Wiley, Wicks & Wing lot were marked "G. A.," or "G. A. The custom house appraisers' certificate as to the Nordlinger lot was not produced. The portwarden's certificate, at the times of the discharge of the cargo, makes no mention of damage by petroleum. All is attributed to sea water and rats. As to the bags marked "C.," "F.," or "R. M. G.," it said they were well stowed and dunnaged, but in one instance, "wet by sea water from leaks in water ways or sweat," and in another "stained by sea water from flowing through the ceiling." The portwarden when on the stand as a witness, testified that he discovered no damage by petroleum when the cargo was coming out.

It also appears that the vessel took out a full cargo of petroleum. On her arrival at Barcelona the cargo was discharged and the hold cleaned and whitewashed. An effort was made also to get the petroleum out from between the timbers. After waiting some days, about thirty tons of ballast was put in and spread upon the bottom, and then part of the cargo of almonds and wine came on board. These almonds constituted the Wiley, Wicks & Wing lot. They were placed next to the ballast and the wine. The vessel then went to * * * when the Nordlinger lot was taken on board with some barrels of capers in vinegar. These were stowed generally on top of the cargo received at Barcelona, and were but little exposed to contact with the ceiling. The vessel then proceeded to Malaga, where the shelled almonds were put on board, and the part of the Nordlinger lot marked "R. M. G." There was besides this received there some oranges, lemons and raisins. These were generally stowed above what was taken on at Barcelona and * * *. It is thus seen that the most of the Nordlinger lot was stowed in such a way as not to be so much exposed to contact with the petroleum mixed with the bilge water, as many of the other parts of the cargo. Neither was it so much exposed to the drip of the sweat in the hold.

Against the force of all these circumstances is brought only the single fact that two fruit merchants or brokers, after this suit was commenced, went to the store of Nordlinger at the request of the libellants, and, after an examination, which I cannot but believe must have been very slight, estimated the damages to the entire lot by petroleum at $450. I am not by any means satisfied that the bags were overhauled to any considerable extent by these appraisers, and one of them in his testimony concedes that while they certified to the number of bags stained and damaged, they took the count as it was given to them by some one else. They do not give the market value of sound almonds when these arrived, neither do they give the value of them as they were found. All they say is, that they estimated the damage in a lump to the whole lot at $450. Nothing can be more unreliable as evidence than mere estimates made in such a way and under such circumstances. Loose ex parte estimates are never entitled to much consideration, and these seem to be even less to be depended on than usual. No one representing the vessel was present at the time the examination was made, and no opportunity has been given to counteract the effect of this testimony by other estimates made by other persons and under different circum-

stances. Taking all these facts together, I am led irresistably to the conclusion that the petroleum damage to this lot was rather imaginary than real, and that the district judge was right in rejecting this item of claim altogether. This makes it unnecessary to consider the right of the vessel to deduct from any damages that might have been given the amount allowed by the government for a rebate of duties on account of the damaged condition of the cargo.

3. The Gomez and Arquinbau lot. The claim here is for oil damage only. The commissioner allowed one hundred and fifty-five dollars for thirty-one bags at five dollars a bag. This I think is all the evidence shows the parties are entitled to. That was the amount claimed in the bill of damages presented to the vessel on the 6th of February on account of stained bags. The only evidence relied on for an increase of this amount is an estimate of merchants called in by the libellants more than three months after this cargo was delivered, and who made an examination similar to that just considered. This estimate is to my mind more unreliable than the other, and not entitled to any consideration. It would have been as easy to have furnished evidence in the cause which would have been entirely satisfactory if there had been any real damage, that I am led to conclude the only reason for its absence is that no such damage in fact existed.

The result is that the libellants are entitled to an allowance upon their charter money as follows:

1. Wiley, Wicks & Wing lot........... $200
2. Gomez & Arquinbau lot............. 155

In all ..................... $355

They are not, however, entitled to costs either in this court or below. When they commenced their suit another was pending on behalf of the vessel to recover the charter money due, in which all the questions which are here presented might have been litigated, and in which a balance will be found due after making all the deductions which are here allowed. It is clear to my mind that there would have been no litigation had it not been for the exorbitant demand made of the vessel by the libellants on the 6th of February.

A decree may be prepared finding due the libellants the sum of $355, and directing that it be applied as so much payment on the charter party as of the date the charter money fell due and became payable.